# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**ANDREA LEVASSEUR,**<br><br>　　　　　　　　　**Debtor**<br>――――――――――――――――<br>**OLD REPUBLIC NATIONAL TITLE**<br>**INSURANCE COMPANY,**<br><br>　　　　　　　**Plaintiff**<br><br>**v.**<br><br>**ANDREA LEVASSEUR,**<br><br>　　　　　　　　**Defendant** | **Chapter 7**<br>**Case No. 07-18259-FJB**<br><br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 08-1229** |

### MEMORANDUM OF DECISION ON
### COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT,
### MOTION TO AVOID JUDICIAL LIEN, AND
### OBJECTION TO CLAIM OF HOMESTEAD EXEMPTION

By its complaint in this adversary proceeding, the plaintiff contends that the defendant debtor obtained $124,200 from Bank of America on the false pretense that her former home equity line of credit was still open and, therefore, that the resulting debt to the plaintiff is excepted from discharge. The debtor responds that she did nothing more than ask for money, which the bank then freely gave her. She had no fraudulent intent, no reason to think that the bank didn't know what it was doing, and therefore no obligation, before accepting the money she had asked for, to make sure the bank knew what it was doing. In two matters tried with the complaint, the plaintiff argues that this same conduct of the debtor is a basis for disallowing or limiting the debtor's homestead exemption and the extent to which that exemption can be used under 11 U.S.C. § 522(f) to avoid the plaintiff's judicial lien for the resulting debt. After a trial of these matters, the Court now makes the following findings and rulings.

**PROCEDURAL HISTORY and ARGUMENTS OF THE PARTIES**

On December 31, 2007, Andrea Levasseur ("Levasseur" or "the Defendant") filed a petition for relief under chapter 13 of the Bankruptcy Code.  One month later, she moved to convert her case to one under Chapter 7, and the motion was granted.  Levasseur has been granted a discharge.  In the schedules she filed in the case, she claimed an exemption under MASS. GEN. LAWS ch. 188, § 1 for her interest in her residence, the real property located at 20 Fatherland Drive, Byfield, Massachusetts (the "Byfield Property").  The value she claimed as exempt was $191,404.  She valued the Byfield Property at $674,000 and disclosed that it was subject to a mortgage in favor of Greenpoint Mortgage in the amount of $482,596.

On March 30, 2008, Levasseur filed the first of the three matters now before the court, a motion under 11 U.S.C. § 522(f)(1)(A) to avoid a judicial lien, an execution held by Old Republic National Title Insurance Company ("Old Republic").  The execution, which is in the amount of $159,845.95, constitutes a lien on the Byfield Property and, Levasseur alleges, impairs the exemption she has claimed as to the unencumbered value in that property.  Therefore, she argues, the lien is subject to avoidance under § 522(f)(1)(A).

Old Republic responded with the second of the three matters before the Court, an objection to Levasseur's claim of exemption as to the value in the Byfield Property.  In the objection, Old Republic makes three arguments.  First, Levasseur's conduct—the conduct that gave rise to its claim and judgment against Levasseur—in combination with her use of this bankruptcy case to discharge the resulting liability and the lien securing it, is cause to disallow the exemption.  Second, and in the alternative, under 11 U.S.C. § 522(q)(1)(B)(ii), the extent of the homestead exemption should be limited to $136,875 because Levasseur owes a debt for fraud.  And third, under 11 U.S.C. § 522(o)(4), the exemption should be reduced by the amount of fraudulently obtained funds that Levasseur used to make mortgage payments on the Byfield Property.  Old Republic also objected to Levasseur's motion to

avoid its judicial lien, essentially asserting these same arguments as cause to deny the motion or to limit

the extent of avoidance.  To these arguments, Levasseur responded (i) that the nondischargeability of a

debt is not a valid basis for denying an exemption, (ii) that § 522(o)(4) does not apply because it

requires, but Old Republic does not allege, that she "disposed of" property with wrongful intent, only (at

worst) that she obtained it wrongfully, and (iii) that no exception in § 522(q) applies to the facts alleged.

On August 29, 2008, Old Republic filed the complaint that commenced the above-captioned

adversary proceeding.  Old Republic seeks a determination that the prepetition judgment it holds

against Levasseur is excepted from discharge as a debt for fraud, false pretenses, or misrepresentation

under 11 U.S.C. § 523(a)(2), larceny under § 523(a)(4), and willful and malicious injury under § 523(a)(6).

Levasseur opposes each count.

The motion to avoid judicial lien, the objection to claim of exemption, and the

nondischargeability complaint were tried together.  The parties stipulated to most of the facts, as set

forth in the List of Stipulated Facts that is trial Exhibit A.  The only witness at trial was Levasseur herself.

After trial, both parties submitted proposed findings of fact and conclusions of law.

**FINDINGS OF FACT**

**a.    Background**

1.    Levasseur was born in in 1964.  After graduating from high school, she graduated from

the Lawrence Memorial School of Nursing in 1986 and attended Regina College for additional training in

nursing.  She has been a registered nurse for more than twenty years.  In addition, she worked part time

as a real estate agent for Century 21 in Ipswich, Massachusetts, for approximately two years in 2002 and

2003.

2.    In 1991, she married Edward Sullivan and took the name Andrea Sullivan.  Together,

they owned a residence in Melrose from 1991 to 1997; this property was subject to a mortgage, which

they refinanced a number of times to obtain a better rate.  After the Melrose property, they together

purchased and owned a home on Wethersfield Street in Rowley, Massachusetts (the "Rowley

Property").  This property too was subject to a mortgage that they refinanced a number of times to

obtain a better rate.

3.        They divorced in 2001 or 2002.  In connection with the divorce, and by deed dated

December 23, 2002 and recorded with the Essex County (Southern District) Registry of Deeds (the

"Registry"), Edward F. Sullivan and Levasseur (then still known as Andrea P. Sullivan) conveyed the

Rowley Property to Levasseur alone.  This transaction, too, involved a refinancing of the property.


**b.        Establishment of Home Equity Line of Credit**

4.        On or around March 14, 2003, Levasseur, still known as Andrea Sullivan, entered into a

loan agreement with Fleet Bank ("Fleet") for a home equity line of credit (the "Fleet Home Equity Line")

and granted Fleet a second-position mortgage on the Rowley Property to secure the Fleet Home Equity

Line (the "Fleet Home Equity Mortgage").  The stated original credit limit for the Fleet Home Equity Line

was $124,200.  She signed the loan agreement and the Fleet Home Equity Mortgage at Fleet's

Newburyport branch.

5.        Levasseur granted the Fleet Home Equity Mortgage to give Fleet a lien on the Rowley

Property as collateral for the amount she owed under the Fleet Home Equity Line Agreement.  At the

time Levasseur signed the Fleet Home Equity Line Agreement, she (i) knew what the term "equity"

meant in connection with a home, (ii) knew the Fleet Home Equity Line Agreement was an agreement to

borrow against the equity she had in the Rowley Property, (iii) knew that the amount of the Fleet Home

Equity Line Agreement was based on the value of the Rowley Property less the amount that was already

loaned against that property because of an existing first mortgage, (iv) knew that Fleet required her to

own her home to obtain the home equity line, (v) knew that a mortgage was a document given to a

bank to give the bank a lien on her home, and (vi) expected that Fleet would have appraised the Rowley

Property in order to arrive at the credit limit for the loan.  On the basis of Levasseur's own ownership of

4

property, her experience in obtaining and refinancing mortgage loans on those properties, her experience as a real estate agent, and her testimony of knowledge of the difference between secured and unsecured loans, I conclude that Levasseur had experience with and was knowledgeable about bank loans and bank lines of credit.

6.      In connection with the Fleet Home Equity Line Agreement Fleet opened two accounts for Levasseur, still under the name of Andrea Sullivan:  a home equity account that was assigned account number 75620032059124 (the "Home Equity Account"); and, at the same time, a checking account that was assigned Account Number 9467788365 (the "Fleet Checking Account").  In connection with the Fleet Checking Account, Fleet sent Levasseur a starter check booklet that Levasseur produced during discovery.  The checks enabled her draw on her available credit by writing checks on this account, up to the credit limit, and she did use at least some of the checks for this purpose.  Levasseur received periodic billing statements at the Rowley Property from Fleet concerning the Home Equity Account; the statements had the Home Equity account number printed on them.

**c.      Acquisition of Byfield Property**

7.      On or about June 30, 2003, Levasseur, still then known as Andrea Sullivan, acquired and became sole owner of the Byfield Property.

**d.      Remarriage**

8.      On October 17, 2003, the Defendant married William Levasseur and, taking his name, became known as Andrea Levasseur.

**e.      Sale of Rowley Property**

9.      On or about November 14, 2003, Levasseur sold the Rowley Property to Christopher Drinan ("Mr. Drinan") and Ellen Carbonell ("Ms. Carbonell") and, from the sale proceeds, directed and authorized the full payoff of her first mortgage loan and of the Fleet Home Account.  Levasseur knew

that proceeds from the sale of the Rowley Property would be used to pay off the Home Equity Account

in full, and the proceeds of the sale were in fact used to pay the Home Equity Account in full.

Accordingly, a U.S. Department of Housing and Urban Development settlement statement (the

"Settlement Statement") that Levasseur executed at the closing reflects a payment to Fleet Bank for a

"Payoff" in the amount of $126,577.27.

10.      Although the Home Equity Account was paid in full, no discharge of the Fleet Home

Equity Mortgage was recorded until much later, after the events that gave rise to the debt presently in

issue.

11.      At the time they purchased the Rowley Property, Mr. Drinan and Ms. Carbonell obtained

an Owner's Title Insurance Policy (the "Policy") from Old Republic.

12.      For the period of time from her acquisition of the Byfield Property on or about June 30,

2003 until she sold the Rowley Property on or about November 14, 2003, Levasseur owned both homes

simultaneously.  She and her family moved to the Byfield Property as soon as she purchased it.  By the

time of the sale of the Rowley Property in November, 2003, Levasseur had already notified Fleet of her

change of address from the Rowley Property to the Byfield Property.

**f.      November 14, 2003 to June 14, 2005**

13.      Levasseur knew the Home Equity Account would no longer be available for her use if she

sold the Rowley Property.  In the time period from November 14, 2003 through June 15, 2005, Levasseur

did not attempt to withdraw funds from the Home Equity Account because she knew that the Home

Equity Account was not available to her because of her sale of the Rowley Property.

14.      On a date not in evidence, but before June 1, 2005, Fleet and Bank of America ("Bank of

America," "BOA," or "the Bank") merged, and Bank of America became the successor by merger to Fleet

with respect to the Fleet Home Equity Line and the Fleet Home Equity Mortgage.  Levasseur knew by

June 1, 2005 that a transaction had occurred between Fleet and Bank of America whereby Fleet became Bank of America.

15.     For the time period from November 14, 2003 through July 19, 2005, Levasseur did not (i) apply for any line of credit or open a bank account of any kind with Bank of America, (ii) apply for or receive another home equity line of credit or loan of any kind from Fleet, or (iii) give Fleet or Bank of America a mortgage on the Byfield Property to secure the Fleet Home Equity Line.

16.     For the time period from November 14, 2003 through July 19, 2005, the Defendant never informed any employee of Fleet or Bank of America that she had sold the Rowley Property.

17.     Levasseur and her husband, William Levasseur ("Mr. Levasseur"), maintained a bank account with Georgetown Savings Bank (the "Georgetown Savings Bank Account") having account number 880054234.  From January 1, 2003 through December 31, 2005, the Georgetown Savings Bank Account was the principal bank account used by Levasseur and Mr. Levasseur to pay bills.  As of June 14, 2005, the balance in the Georgetown Savings Bank Account was approximately $913.81.

18.     The only document that Levasseur produced in discovery that resembles a letter or statement is the Fleet/Bank of America statement (the "Fleet/BOA Statement") that is Plaintiff's Exhibit 8.  Though the Fleet/BOA Statement is undated, it specifies that it reflects a billing period that closed on September 3, 2004, with a "payment due date" of September 28, 2004.[1]  It was received by Levasseur at her Byfield Property in September, 2004.  The addressee of the Fleet/BOA Statement is identified as "Andrea P. Sullivan," without mention of the name Levasseur.  In two places, the Fleet/BOA Statement indicates that it pertains to account number 75620032059124, which is the number of Fleet Home Equity Account.  In the upper right corner, under the Fleet logo, appear the words "CREDIT LINE."  The Fleet/BOA Statement further states that the "credit limit" for the account is $124,200 and, most notably, that "available credit" is also $124,200.

---

[1] The balance due was "$0.00."  In fact, the Fleet/BOA Statement indicated that the account had a negative balance—that is, a credit balance—of $189.99.

19.     Levasseur received the Fleet/BOA Statement and others like it that were mailed to her monthly by Fleet or Bank of America between November 2003 and June 2005.  At least from the Fleet/BOA Statement, if not also from others, Levasseur noted and understood that they indicated available credit of $124,200 on the Fleet Home Equity Account and that the Fleet Home Equity Account had become a Bank of America account.

20.     As of June, 2005, Mr. Levasseur was the owner of a sheet metal company known as American Ventilation, Inc. ("AVI"), AVI was in financial distress, and Levasseur's family was having trouble paying its bills.  AVI's financial troubles were the principal reason for the financial problems Levasseur's family was facing in June, 2005.

**g.     Events of June 15, 2005 through July 19, 2005**

21.     On or about June 15, 2005, Levasseur wrote a check that she made payable to "Andrea P. Sullivan" in the amount of $50,000.00 ("Fleet Check No. 93").  Fleet Check No. 93 was a starter check issued to Levasseur in connection with her Fleet Checking Account with an assigned Account No. 94677883653.  Levasseur wrote "75620032059124," the number of the Home Equity Account, in the "MEMO" portion of Fleet Check No. 93.  Levasseur endorsed the back of Fleet Check No. 93. The endorsement contains two signatures by Levasseur, one in the name "Andrea P. Sullivan" and the other in the name "Andrea Levasseur," and includes the handwritten notation "FOR DEPOSIT ONLY 880054234."  Levasseur deposited Fleet Check No. 93 into the Georgetown Savings Bank Account.

22.     As of June 15, 2005, the Fleet/Bank of America account bearing the number 94677883653, which was the printed account number on Fleet Check No. 93, was a closed account.

23.     On June 16, 2005, Levasseur obtained an Official Check, check number 162415739, from Bank of America's Newburyport Branch made payable to "Andrea Levasseur" in the amount of $100,000.00 ("BOA Check No. 162415739").  Levasseur endorsed BOA Check No. 162415739 and deposited it into the Georgetown Savings Bank Account on June 16, 2005.

24.     On or about June 21, 2005, the Georgetown Savings Bank Account was debited in the amount of $50,000.00 due to the fact that Fleet Check No. 93 was returned for nonsufficient funds.

25.     On July 19, 2005, Levasseur obtained a Cashier's Check, check number 0055728, from Bank of America's Newburyport branch made payable to "Andrea P. Sullivan" in the amount of $24,200.00 ("BOA Check No. 55728").  Levasseur endorsed BOA Check No. 55728 and deposited it into the Georgetown Savings Bank Account on July 19, 2005.

26.     The BOA Newburyport Branch where Levasseur obtained BOA Check No. 162415739 and BOA Check No. 55728 and purportedly verified the availability of funds was the same BOA Newburyport Branch maintained by Fleet where, in March 2003, Levasseur had executed closing documents related to the Fleet Home Equity Line Agreement.

27.     In June and July, 2005, when Levasseur physically went to the BOA Newburyport branch to obtain the bank checks numbered 162415739 and 55728, she did not inform the teller or any bank employee that she no longer owned the Rowley Property; nor did she inform the teller or any bank employee that she had paid off her Fleet Home Equity Line at the time of the sale of the Rowley Property.  Levasseur did not meet with anyone at the Bank of America other than the teller that she obtained the checks from.

28.     Aside from the above facts, the substance and details of Levasseur's conversations and interactions with Bank of America employees on June 16 and July 19, 2005, when Levasseur physically went to the BOA Newburyport branch to obtain the bank checks numbered 162415739 and 55728, are highly uncertain.  Levasseur repeatedly testified that she had little or no memory of what transpired: whether she brought the Fleet/BOA Statement with her and presented it to the teller, what conversation transpired.  Other times she testified to certain details.  She testified:  "I did ask at one point, though, if this was an account that I could use, and -- and I -- I believe she said yes."  Levasseur did not specify the account she was referring to in this testimony.  For this reason and because she herself

testified to having no memory of the details, I attribute no probative value to this testimony or any she offered about her interactions with the Bank's employees.

29.       In June and July, 2005, when Levasseur physically went to the BOA Newburyport branch to obtain checks numbered 162415739 and 55728, the BOA employees had no way to determine from their computers or records on hand at the Bank whether Levasseur still owned the Rowley Property or whether the Fleet Home Equity Line had been paid off and was no longer available to her to use.  All that the BOA employees could review was whether the Fleet Home Equity Line Agreement was listed as an open home equity line and what the credit limit on that line was and how much of that credit was still available.  Due to inadvertence, the Fleet Home Equity Line Agreement was not closed at the time of Levasseur's sale of her Rowley property in 2003, and, as a result, the BOA Newburyport branch employees would have had no way of knowing that this Home Equity Account should have been closed and that Levasseur's request to use the account should be denied.  Had the employees at the BOA Newburyport branch that signed and issued checks numbered 162415739 and 55728, Patricia Rhodes and Karena Morse, been informed by Levasseur that she had sold and no longer owned the home that was the collateral for the Fleet Home Equity Line (the Rowley Property) or that the Fleet Home Equity Line had been paid off at the time of the sale of the Rowley Property, then neither Ms. Rhodes nor Ms. Morse would have prepared, signed, and delivered checks numbered 162415739 and 55728 to Levasseur, and the Bank of America would have refused to allow the Home Equity Account to be used by Levasseur.

30.       Levasseur, in explaining how she went to BOA's Newburyport Branch to confirm whether funds were available to her, testified that she believed "it was a completely different loan number, completely different address.  It had nothing to do with [the Rowley Property]."  This testimony is not credible.  She knew that the loan number was the number of her Fleet Home Equity Account, as evidenced by the fact that she had hand-written that number onto Fleet Check No. 93, and by the

further fact that she had used Fleet Check No. 93 at all.  That check, she knew, was one of the checks

that Fleet had given her to draw against her line of credit.  She also knew that the name on the

Fleet/BOA Statement was Andrea Sullivan, not Levasseur, indicating that it could not be a recent

account, as she had ceased using the name Sullivan in 2003.  She knew she had not applied for any new

loan since her payoff of the Fleet Home Equity Account in November 2003.  The document that

prompted Levasseur to attempt to obtain funds from Bank of America in June and July, 2005, was not

any loan solicitation or offer from Bank of America—she adduced no evidence of any such solicitation or

offer—but the Fleet/BOA Statement.  And the amount that she requested and obtained in her two visits

to the Newburyport branch was exactly the amount of credit limit on her Fleet Home Equity Account.

For all these reasons, her testimony that she thought she was drawing on an entirely different loan is

thoroughly implausible.  Moreover, Levasseur's reliance on this false testimony only demonstrates a

willingness on her part to rely on artifice and deception, making all the more plausible Old Republic's

allegations of fraudulent intent in the underlying transactions.

       31.      Levasseur knew from the Fleet/BOA Statement that it was possible that Fleet and Bank

of America had inadvertently left the line of credit open.  She might also have believed it was *possible*

that Bank of America had decided, knowingly, to continue lending on this account notwithstanding that

the Rowley Property had been sold and that Bank of America no longer had security for the line of

credit.[2]  Even if she did so believe, this is not the same as certainty or confidence that Bank of America

knew what it was doing in honoring her requests to draw on the line of credit.  Levasseur knew it was

much more likely that, in failing to close the account, Fleet and Bank of America had simply made a

mistake, a mistake of which Bank of America was then unaware.  She did nothing to make sure that this

was not the case.  Instead she exploited the probable mistake.

---

[2] The mortgage had never been discharged, and so the line of credit in fact remained secured; but there is no
evidence that Levasseur was aware of this fact.  In any event, Levasseur surely knew that the line of credit was no
longer secured by property *belonging to her*.

32.     At trial, Levasseur, when asked whether she had informed the teller that she no longer

owned the Rowley Property and had paid off the Fleet Home Equity Line, answered, "I didn't think I had

to."  In order to credit this testimony, I would have to find that Levasseur could, *without compunction*,

knowingly ask for and take $124,000 on the basis of a mistake of which she knew, or strongly suspected,

that the Bank was unaware.  She did not appear to me to be so lacking in moral judgment, and therefore

I do not credit this testimony.  For example, when asked by her attorney whether she had done anything

or said anything to induce Fleet or Bank of America not to close the account, she said "Of course not," a

denial not only that she could do the thing but also that she could be so morally callous.  In any event,

she does not deny that she knowingly exploited a mistake on the part of the Bank.

33.     By presenting herself at the Newburyport branch of Bank of America as entitled to draw

down on the Fleet Home Equity Line, Levasseur created a false pretense.  Levasseur effected the false

pretense with knowledge of its falsity or at least reckless disregard for the truth of the matter and with

intent to deceive, to exploit rather than clarify a probable mistake.  Her intent to deceive is evidenced by

her knowledge of the probable error, her failure to inquire about it, and her drafting and deposit of Fleet

Check No. 93.

34.     Bank of America, through its employees, relied on the false pretense and was injured as

a result.  In view of (i) the failure of Bank of America to close the account in its records and systems and

(ii) the fact that her line of credit had earlier been valid and, for lack of corrective action, continued to

appear so, the falsity of Levasseur's pretense was not readily apparent to the bank employees to whom

it was made.  Their information was no better than what was available in Bank of America's records, and

these were in error.  The error obscured the falsity of Levasseur's claim of entitlement to draw upon the

line of credit; and nothing about Levasseur's requests for the funds served as a signal that further

inquiry was warranted.

35.     Other than the two BOA Checks and the attempted deposit of Fleet Check No. 93, the only deposits into the Georgetown Savings Bank Account from June 15, 2005 through August 1, 2005, totaled approximately $4,593.98.  In the same time period, Levasseur and Mr. Levasseur wrote eight checks, in the aggregate amount of $88,000.00, made payable to AVI from the Georgetown Savings Bank Account.

36.     According to the Georgetown Savings Bank statements and checks produced pursuant to subpoenas, for the period from June 15, 2005 through August 15, 2005, Levasseur made the following mortgage payments from funds withdrawn from the Georgetown Saving Bank Account: (1) a June 20, 2005 payment of $4,499.70 to Greenpoint Mortgage (web payment); (2) a June 29, 2005 payment of $2,231.83 to NCMC Mortgage (web payment)[3]; and (3) a June 30, 2005 check to Greenpoint Mortgage (Check No. 4438) in the amount of $4,499.70, which was withdrawn from the Georgetown Saving Bank Account on July 12, 2005.

**h.     Events after July 19, 2005**

37.     Levasseur contends that she made the following four payments, and no others, to Bank of America from January 1, 2005 to the present: (i) $859 on December 12, 2005; (ii) $845 on October 15, 2001[4]; (iii) $763.37 on September 6, 2005; and (iv) $381.69 on July 18, 2005.  The records of Bank of America, which I credit as accurate, reflect the following regarding these alleged payments:  (i) the payment of $859.00 was received on or about January 27, 2006 and reversed on or about February 8, 2006 for insufficient funds; (ii) there is no record of an attempted payment in the amount of $845; (iii) the payment of $763.37 was received on or about August 29, 2005 and reversed on or about August 31, 2005 for insufficient funds; and (iv) the payment of $381.69 was received on or about July 22, 2005.  In

---

[3] The record includes no identification of NCMC Mortgage and no details of the mortgage loan on which this payment was made.  The record does not identify the obligor on the loan, the property securing the loan, and the owner of that property.

[4] The 2001 date is a typographical error; the intended year is probably 2005 and certainly no earlier.  In any event, there is no record that this payment was in fact made at all, in any year.

sum, Levasseur made only one payment that was not reversed for insufficient funds, for total payment of $381.69 on the advances she took in June and July, 2005.

38.     After Levasseur obtained $124,200 from the Home Equity Account and then failed to make payments on the Home Equity Account, Bank of America commenced a mortgage foreclosure action against the Rowley Property, then still owned by Mr. Drinan and Ms. Carbonell.  Old Republic received a Notice of Claim under the title insurance policy that Mr. Drinan and Ms. Carbonell had purchased (the "Title Claim"); the Title Claim arose from the institution of foreclosure proceedings by Bank of America against the Rowley Property.  The nature of the Title Claim was that Mr. Drinan and Ms. Carbonell had received notice of foreclosure proceedings against the Rowley Property relative to the Fleet Home Equity Mortgage.

39.     In order to prevent the foreclosure of the Rowley Property, and pursuant to its obligations and rights under the Policy, Old Republic paid to Bank of America the total amount that Levasseur had obtained from the Home Equity Account and failed to repay.

40.     On or about July 13, 2006, Bank of America assigned all of its rights against Levasseur to Old Republic.

41.     On October 30, 2006, Mr. Levasseur filed a Chapter 7 Voluntary Petition in this Court, Docket No. 06-13945.  AVI ceased doing business on the day Mr. Levasseur filed his Chapter 7 petition.

42.     On October 26, 2006, Old Republic filed a lawsuit against Levasseur in Essex County Superior Court, Docket No. ESCV2006-02049 (the "Lawsuit").  On October 31, 2006, a prejudgment Writ of Attachment was recorded with the Essex County (Southern District) Registry of Deeds at Book 26236, Page 260 attaching the goods or estate of Levasseur.  Levasseur did not file an answer to, or otherwise defend, the Lawsuit, and a default judgment was entered in favor of Old Republic on or about May 23, 2007.

43.     On July 30, 2007, an execution was issued by the Superior Court in the amount of $157,764.01. Old Republic levied upon the Byfield Property by having the execution recorded with the Registry District as Document No. 481557 with Certificate of Title No. 76172.  On September 12, 2007, an alias execution was issued by the Superior Court in the amount of $159,845.95, with postjudgment interest accruing on this amount at the rate of 12 percent per annum. Old Republic levied upon the Byfield Property by having the alias execution recorded with the Registry District as Document No. 482892 with Certificate of Title No. 76172.  Old Republic levied upon the Byfield Property by having the Execution filed with the Registry District as Document No. 482892 with Certificate of Title No. 76172.

44.     On December 31, 2007, Levasseur filed in this court a voluntary petition for relief under chapter 13 of the Bankruptcy Code, thereby commencing the present bankruptcy case, Case No. 07-18259.  On February 4, 2008, the case was converted to one under Chapter 7.

45.     For the purposes of this case, the value of the Byfield Property is $674,000.00, and the liens on the Byfield Property total $482,596.00, exclusive of the Old Republic execution lien.  Other than Old Republic, the only party holding a secured claim on the Byfield Property is Bank of America as successor to Greenpoint Mortgage.  The equity left in Levasseur's Byfield Property after the first and only lien, other than Old Republic's lien, is no less than $191,404.

46.     Other than a priority unsecured claim for $2,204 for "Taxes owed for Unemployment Overpayment," the total amount of unsecured debt scheduled by Levasseur in her bankruptcy schedules was $264,795, of which $159,000 was Old Republic's judgment against her.

**JURISDICTION**

The matters before the court are a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt, an objection under 11 U.S.C. § 522(l) to a debtor's claim of exemption, and a motion under 11 U.S.C. § 522(f) to avoid a judicial lien.  All three arise under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b)

and, by standing order of reference,[5] referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  All

three are core proceedings within the meaning of 28 U.S.C. § 157(b)(1).[6]  The bankruptcy court

accordingly has authority to enter final orders on them.


**DISCHARGEABILITY**

Old Republic seeks a determination that its judgment debt is excepted from discharge under

each of three separate subsections of 11 U.S.C. § 523(a).  In each instance, the burden of proof is a

preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654 (1991)

(preponderance of the evidence standard applies to all exceptions from dischargeability in § 523(a)). The

burden falls upon Old Republic as the party asserting an exception from discharge.  *Palmacci v.

Umpierrez*, 121 F.3d 781, 786-87 (1st Cir. 1997).  As a judgment creditor, Old Republic plainly has

standing to seek a determination of nondischargeability as to its judgment debt.  Levasseur does not

dispute Old Republic's standing.  "Exceptions to discharge are narrowly construed in furtherance of the

Bankruptcy Code's 'fresh start' policy, and, for that reason, the claimant must show that his claim comes

squarely within an exception enumerated in Bankruptcy Code § 523(a)."  *Id*. (internal quotations

omitted).


**a.**    **Section 523(a)(2)(A):  False Pretenses, False Representation, or Actual Fraud**

In relevant part, § 523(a)(2)(A) of the Bankruptcy Code excludes from discharge any debt for

money or an extension or renewal of credit to the extent obtained "by false pretenses, a false

representation, or actual fraud[.]"  11 U.S.C. § 523(a)(2)(A).  The quoted phrase is in the disjunctive, but

Old Republic contends that its judgment debt is one for money and an extension of credit obtained by

false pretenses, a false representation, *and* actual fraud, all three.  Old Republic relies heavily on the

---

[5] The order of reference is codified in the district court's local rules at L.R. 201, D. Mass.

[6] See 28 U.S.C. § 157(b)(2)(B), (I), and (K) (core proceedings include allowance or disallowance of exemptions from
property of the estate,  proceedings to determine the dischargeability of a particular debt, and determinations of
the validity or extent of a lien).

case of *Merchants National Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785 (B.A.P. 8th Cir. 1999)

(where debtor, upon discovering creditor's mistake in failing to close line of credit, did not notify

creditor of its error but wrote additional checks thereon, his conduct was properly deemed false

pretenses, a false representation, and actual fraud under § 523(a)(2)(A)).  In particular, Old Republic

contends that Levasseur's silence as to a material fact, the sale of the Rowley Property, was itself a false

representation, or at least made her request for credit into a false pretense of entitlement, and can

constitute a basis for nondischargeability under § 523(a)(2)(A) notwithstanding BOA's own negligence in

failing to close the line of credit.  Levasseur responds that she had no duty to tell the Bank anything

because all the relevant facts were within the Bank's knowledge and because she was not a fiduciary to

the Bank.  Therefore, her silence cannot constitute a false representation.  Levasseur also contends that

BOA did not actually rely on any representation she may have made; rather, it consulted its own

records, and she is not responsible for errors those records may have contained.  For the same reason,

she contends that any actual representation by BOA was not justifiable.

Where an exception from discharge under § 523(a)(2)(A) is based on a false representation, the

plaintiff must show that the debtor (1) made a false representation (2) with fraudulent intent

("scienter") and (3) intent to induce reliance on the representation, and that the misrepresentation (4)

did induce reliance, (5) which was justifiable and (6) caused damage, pecuniary loss.  *Palmacci*, 121 F.3d

at 786; *In re Burgess*, 955 F.2d 134, 139 (1st Cir. 1992) (as to elements other than reasonableness or

justifiability of reliance).  Where the exception is based on false pretenses, the requirements are largely

the same, except that the requirement of a false representation is replaced by a requirement of a false

pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor.

*Moen*, 238 B.R. at 791; *Sun Trust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr. S.D. Ga.

2002) (as distinguished from false representation, which is an express misrepresentation, false pretense

involves an implied misrepresentation or conduct intended to create and foster a false impression); *H.C.*

*Prange Company v. Schnore (Matter of Schnore)*, 13 B.R. 249, 251-252 (Bankr. W.D. Wis. 1981) (same).

Silence—that is, the failure to disclose something that one was obligated to disclose—can form the basis

of a finding of false pretense. *Moen*, 238 B.R. at 791 and cases cited; *Drake Capital Securities v. Larkin*

*(In re Larkin)*, 189 B.R. 234, 239 (Bankr. D. Mass. 1995).  The duty to disclose can be created by the false

pretense itself.

> [W]hen the circumstances imply a particular set of facts, and one party
> knows the facts to be otherwise, that party may have a duty to correct
> what would otherwise be a false impression. This is the basis of the
> "false pretenses" provision of Section 523(a)(2)(A).

*Moen*, 238 B.R. at 791 (citations and internal quotations omitted).  If the disclosure is needed to avert

the creation of a false pretense, a known misunderstanding, the disclosure becomes obligatory.  Still, as

is implicit in the requirement of fraudulent intent, the false pretense must be deliberately fostered and

not merely the result of inadvertence.  *In re Grenier*, 2009 WL 763352 *10 (Bankr. D. Mass. 2009).

Here it is undisputed that, on two separate occasions, Levasseur approached a teller at Bank of

America and requested an advance of funds on her line of credit.  The line of credit appeared to the

tellers to be open and valid.  Levasseur knew that her entitlement to credit was doubtful at best, and

she further knew that Bank of America as a whole, and the tellers in particular, were probably in the

dark about the basis for that doubt:  the fact that she had sold the property that secured the line of

credit.  By requesting draws on the line of credit, she made claims of entitlement to those draws without

taking measures to dispel the Bank's misunderstanding.  Given that she knew of the misunderstanding,

her demand for funds in combination with her failure to disclose the infirmity in her demand amounted

to a false pretense.  Old Republic has further demonstrated by a preponderance of the evidence that on

each occasion, Levasseur employed this pretense with knowledge of its falsity, with knowledge that she

was exploiting a false pretense of entitlement, and with intent to induce reliance on it.  The first three

requirements of a false pretense under § 523(a)(2)(A) are therefore satisfied:  Levasseur (1) made a false

representation (2) with fraudulent intent and (3) intent to induce reliance on the representation.

Bank of America relied on the representation.  It certainly would not have disbursed the funds
without Levasseur's demand and implicit claim of entitlement.  The fact that it checked its own records,
and thus relied on them, too, before disbursing the funds to her does not negate its reliance on her false
pretense.  The bank's own records merely confirmed (albeit erroneously) what Levasseur had implicitly
represented, that she had a valid right to draw on the line of credit; the bank thus relied on both
together.  Moreover, Bank of America's erroneous records are part of Levasseur's false pretense.  Her
false claim of entitlement was a knowing exploitation of the error in the bank's false records.  Reliance
on those records is reliance on the false pretense itself.

In addition, Bank of America's reliance was justifiable.  Reliance is justifiable if the falsity of the
representation would not have been readily apparent to the person to whom it was made.  *Field v.
Mans*, 516 U.S. 59, 70-72, 116. S.Ct. 437, 443-45 (1995).  The falsity of the representation here was not
readily apparent to Bank of America or its tellers.  The tellers checked their records, but the records
were in error and therefore of no help.  To be sure, the error in the records was the fault of Bank of
America (including Fleet as its predecessor in interest), not of Levasseur.  Still, the error occurred earlier,
and it conditioned what Bank of America and its tellers could know and understand on the days when
Levasseur asked for draws on her line of credit.  The Bank's reliance was therefore justifiable.

There is no dispute as to the sixth and last element, that Bank of America was damaged as a
result of its reliance.  It extended credit that was not secured by property belonging to Levasseur.  By
happenstance of the nondischarge of the mortgage securing the line of credit, the extension of credit
injured Old Republic's insureds and consequently Old Republic itself.  Old Republic's judgment against
Levasseur arises directly from that reliance and quantifies damages arising from the false pretenses that
are the basis of this action.  *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 1216 (1998) ("the
phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose any limitation on the extent to
which 'any debt' arising from fraud is excepted from discharge. . . .  Once it is established that specific

money or property has been obtained by fraud . . . "any debt" arising therefrom is excepted from

discharge."). In summary, Old Republic has carried its burden as to each element of nondischargeability

on the basis of false pretenses.[7] Its judgment against Levasseur is excepted from discharge.

**b.      Section 523(a)(4):  Larceny**

Section 523(a)(4) excepts from discharge debts for "larceny." Old Republic argues that its

judgment debt is excepted from discharge under § 523(a)(4) as one for larceny. It contends that

Levasseur's conduct constitutes a species of larceny known as larceny by false pretense. Citing only

Massachusetts criminal law on the crime known by that name, Old Republic contends that larceny by

false pretense requires proof of four elements:

> (1) that a false statement of fact was made; (2) that the defendant knew
> or believed the statement to be false when he made it; (3) that the
> defendant intended that the person to whom he made the statement
> would rely on it; and (4) that the person to whom the false statement
> was made did rely on it and, consequently, parted with property.

*Commonwealth v. Lewis*, 48 Mass. App. Ct. 343, 350 (1999). Old Republic offers no support for the

proposition that larceny by false pretense, so defined, is larceny within the meaning of § 523(a)(4).

Levasseur responds that larceny in § 523(a)(4) requires a wrongful taking without the owner's consent.

Here, there was no taking; rather, as Old Republic acknowledges, Bank of America parted with

possession voluntarily. The Court agrees with Levasseur that "larceny," as used in § 523(a)(4), is

confined to larceny in the strict sense, which requires the debtor to have obtained possession

wrongfully. *Hancock v. Caliri (In re Caliri)*, 335 B.R. 2, 12 (Bankr. D. Mass. 2005) (larceny requires

wrongful taking); *Farley v. Romano (n re Romano)*, 353 B.R. 738, 765 n. 10 (Bankr. D. Mass. 2006)

(larceny is distinguished from embezzlement in that the debtor's original acquisition of possession was

---

[7] Having so concluded, I need not address Old Republic's further contention that Levasseur's conduct also
constitutes actual fraud within the meaning of § 523(a)(2)(A). If it does, it does so for exactly the same reasons as
it has been found to constitute false pretenses.

unlawful).  Lacking a requirement of wrongful taking, "larceny by false pretense" is not larceny within

the meaning of § 523(a)(4).

**c.        Section 523(a)(6):  Willful and Malicious Injury**

Old Republic further contends that its judgment is also excepted from discharge under §

523(a)(6) as a debt for willful and malicious injury.  Levasseur argues that as a matter of law, Bank of

America was not injured by the advances on her line of credit because it is in the business of making

loans.  Levasseur further contends that she caused no injury:  she had no duty to disclose any

information to Bank of America, she argues, and therefore she cannot, by her silence or omission, have

caused injury.

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor

to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  The requirements of this

exception are as follows:

> The Plaintiff must show that the Debtor injured her or her property and
> that the injury was both "willful" and "malicious."  "Willfulness"
> requires a showing of intent to injure or at least of intent to do an act
> which the debtor is substantially certain will lead to the injury in
> question.  *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d
> 90 (1998). "Malicious" requires the injury to have been "wrongful,"
> "without just cause or excuse," and "committed in conscious disregard
> of one's duties."  *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859
> (1st Cir.1997).  Malice thus has both objective and subjective elements:
> the injury must have been objectively wrongful or lacking in just cause
> or excuse; and the debtor must have inflicted the injury in "conscious
> disregard" of her duties, meaning that she has to have been aware that
> the act was wrongful or lacking in just cause or excuse.

*Burke v. Neronha (In re Neronha)*, 344 B.R. 229, 231-32 (Bankr. D. Mass. 2006).

The first requirement is injury to another entity or the property of another entity.  This

requirement is satisfied in that, by false pretenses, Levasseur obtained Bank of America's funds and

used them in a manner inconsistent with the Bank's right to and interest in those funds.  I reject

Levasseur's suggestion that, because Bank of America is in the business of making loans, it cannot have

been hurt by this borrowing under false pretenses.  When a lender is induced to advance funds under false pretenses, it can be and is damaged.

The second requirement, that the injury have been willful, is satisfied because Levasseur deliberately used a false pretense to obtain this money from Bank or America, knowing it would part the Bank from its money in a manner inconsistent with the earlier borrowing agreement between them. The Bank necessarily would be injured by the false pretense she deliberately employed.  It makes no difference that she may have intended to repay the "borrowed" monies.  This was not a loan but theft of funds under the false pretense of a valid lending relationship.  Her taking and spending of the funds were inconsistent with the Bank's rights to those funds.  The Bank was injured regardless of whether the injury would later be redressed.

The third requirement, that the injury have been malicious, is satisfied because Levasseur took the money under a false pretense, with knowledge of the infirmity of her demand for funds and intent to deceive.  Her acts were thus both objectively wrongful and committed in conscious disregard of her duty not to deceive.  In sum, Old Republic's judgment is a debt for willful and malicious injury and therefore is excepted from discharge under § 523(a)(6).

**OBJECTION TO HOMESTEAD EXEMPTION**

Old Republic objects to Levasseur's claim of a homestead exemption as to her interest in the Byfield Property.  A party objecting to a claim of exemption bears the burden of proving that the exemption is not properly claimed.  Fed. R. Bankr. P. 4003(c).  In support of its objection, Old Republic advances three arguments.

First, Old Republic argues that Levasseur's conduct—the conduct that gave rise to the above determination of nondischargeability—in combination with her use of this bankruptcy case to discharge the resulting liability and the lien securing it, is cause to disallow the exemption.  Levasseur responds that the nondischargeability of a debt—or the presence of cause to except a debt from discharge—is not

per se cause to deny an exemption.  The Court agrees with Levasseur that the Bankruptcy Code in general, and § 522 in particular, do not permit denial of an exemption on the basis of conduct that would except a debt from discharge under § 523(a)(2), (4), or (6).  Congress has created limited exceptions from the ability to claim an asset as exempt.  See 11 U.S.C. § 522(o), (p), and (q).  The causes for denying or limiting an exemption are therefore limited, and unless one of the expressly articulated exceptions applies, a claim of exemption should not be disallowed.  11 U.S.C. § 522(b)(1) ("an individual debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection").  Sections 727(a), 523(a), and 522(o) and (q) show clearly that Congress has carefully considered the extent to which wrongful conduct is cause to deny bankruptcy relief to a debtor.  The courts are not free to broaden the consequences of a debtor's wrongful conduct beyond those that Congress has specified.

Second, and in the alternative, Old Republic argues that under 11 U.S.C. § 522(q)(1)(B)(ii), the extent of the homestead exemption should be limited to $136,875 because Levasseur owes a debt for fraud.  As of the date of the commencement of this case, subsection (q)(1)(B)(ii) stated:

> As a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) which exceeds in the aggregate $136,875[8] if--
>
> (B) the debtor owes a debt arising from--
>
>> (ii) fraud, deceit, or manipulation in a fiduciary capacity or in connection with the purchase or sale of any security registered under section 12 or 15(d) of the Securities Exchange Act of 1934 or under section 6 of the Securities Act of 1933.

11 U.S.C. § 522(q)(1)(B)(ii).  In order for this limitation to apply, the objecting party must show not merely fraud or deceit but fraud or deceit "in a fiduciary capacity or in connection with the purchase or sale of any security registered under section 12 or 15(d) of the Securities Exchange Act of 1934 or under

---

[8] This amount was subsequently increased to $146,450.  The Court must apply the version of the statute that applied on the date of Levasseur's bankruptcy filing.

section 6 of the Securities Act of 1933." There has been no showing here, and Old Republic does not

purport to have shown, that Levasseur's fraud and deceit were committed either in a fiduciary capacity

or in connection with the purchase or sale of any security. This limitation therefore does not apply.

Third, Old Republic argues that, under 11 U.S.C. § 522(o)(4), the exemption should be reduced

by the amount of fraudulently obtained funds that Levasseur used to make mortgage payments on the

Byfield Property. In relevant part, subsection (o)(4) states:

> For purposes of subsection (b)(3)(A), and notwithstanding
> subsection (a), the value of an interest in--
>
> (1) real or personal property that the debtor or a dependent of the
> debtor uses as a residence; . . . or
>
> (4) real or personal property that the debtor or a dependent of the
> debtor claims as a homestead;
>
> shall be reduced to the extent that such value is attributable to any
> portion of any property that the debtor disposed of in the 10-year
> period ending on the date of the filing of the petition with the
> intent to hinder, delay, or defraud a creditor and that the debtor
> could not exempt, or that portion that the debtor could not
> exempt, under subsection (b), if on such date the debtor had held
> the property so disposed of.

11 U.S.C. § 522(o)(4). Levasseur responds that this subsection does not apply because it requires, but

Old Republic does not allege, that she "disposed of" property with wrongful intent; at worst, Old

Republic alleges only that that she obtained the funds wrongfully.

The Court agrees with Levasseur that Old Republic has not carried its burden, or even made the

necessary allegations, with respect to this limitation. Subsection (o)(4) requires a showing (a) that a

definite portion of the property claimed as exempt is attributable to property "that the debtor disposed

of . . . with the intent to hinder, delay, or defraud a creditor" and (b) that the debtor could not exempt

the property, or a portion of the property, so disposed of. Old Republic has not alleged that Levasseur

"disposed of" the funds with intent to hinder, delay, or defraud a creditor. The required allegation

sounds in fraud and therefore had to be specifically pleaded. Fed. R. Civ. P. 9(b) (in alleging fraud, a

party must state with particularity the circumstances constituting fraud), made applicable by Fed. R.

24

Bankr. P. 9014(c) and 7009.  Old Republic did not plead *this* fraud with particularity.[9]  Nor has it alleged

or purported to show that the transfers in question—Levasseur's use of funds obtained from Bank of

America to make mortgage payments on the Byfield Property—were of funds that Levasseur could not

have exempted.  The limitation in subsection (o)(4) therefore does not apply.  Having thus found

wanting each of Old Republic's argument, the objection to Levasseur's homestead exemption must be

overruled in its entirety.


**MOTION TO AVOID JUDICIAL LIEN**

Levasseur has moved under 11 U.S.C. § 522(f)(1)(A) to avoid Old Republic's judicial lien, its

execution in the amount of $159,845.95, on the basis that it impairs the exemption she has claimed as

to the otherwise unencumbered value in the Byfield Property.  For purposes of this case, the value of

the Byfield Property is $674,000.00, and the encumbrances on the Byfield Property, exclusive of Old

Republic's execution, total $482,596.00.  The equity left in the Byfield Property after the first and only

lien, other than Old Republic's, is $191,404, the amount that Levasseur has claimed as exempt under

MASS. GEN. LAWS ch. 188, § 1.

In opposition to this motion, Old Republic advanced three arguments.  The first was that a

determination of nondischargeability against Levasseur would be grounds for disallowance of her

homestead exemption and denial of this motion.  This argument was articulated in Old Republic's initial

response to the motion but, in Old Republic's proposed findings and conclusions, was not later

reiterated.  Rather, Old Republic appears now to concede, as it must, that a motion to avoid a judicial

lien under § 522(f) requires only a simple arithmetic test that does not permit a court, in its discretion,

to consider factors extraneous to § 522(f).  *Snyder v. Rockland Trust Company (In re Snyder)*, 249 B.R. 1,

4-5 (B.A.P. 1st Cir. 2002) (the statute on its face provides for a straight mathematical formula and

---

[9] In its objection to claim of exemption, Old Republic alleges that Levasseur "procured the Fraudulent Funds with
the intent to hinder delay and defraud a creditor."  It does not allege that she disposed of them with intent to
hinder, delay, or defraud, much less state with particularity the circumstances constituting such fraud.

contains no provision for a court to consider other factors).  The determination of nondischargeability, and the circumstances giving rise to it, are irrelevant to disposition of this motion.

By its second and third arguments, Old Republic argued that, by operation of the limitations imposed by subsections 522(o)(4) and (q)(1)(B)(ii), Levasseur's homestead exemption should be limited to $125,643.77, and therefore Old Republic's lien should not be avoided to the extent of the difference between that sum and the unencumbered value in the property; to that extent of that difference, the lien does not impair the exemption.  These arguments are unavailing.  The Court has already rejected Old Republic's arguments under subsections 522(o)(4) and (q)(1)(B)(ii).  Having found no basis for limiting Levasseur's claim of exemption, the exemption must be honored to the full extent of the amount claimed, which covers all the otherwise unencumbered value in the property.  Therefore, Old Republic's lien in its entirety impairs the exemption, and § 522(f)(1)(A) requires avoidance of the lien in full.[10]  11 U.S.C. § 522(f)(1)(A) ("the debtor may avoid the fixing of a judicial lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section").

**CONCLUSION**

For the reasons set forth above, the Court will, by separate orders, (i) enter judgment declaring that Levasseur's judgment debt to Old Republic is excepted from discharge under § 523(a)(2)(A) and (a)(4), (ii) overrule Old Republic's objection to Levasseur's homestead exemption, and (iii) avoid Old Republic's judicial lien on the Byfield Property.

Date:  October 29, 2012

Frank J. Bailey
United States Bankruptcy Judge

---

[10] Old Republic does not dispute that, unless a limitation in subsections 522(o)(4) and (q)(1)(B)(ii) is applicable, the entirety of its lien impairs Levasseur's homestead exemption, and therefore its lien is avoidable in full.